Rev. Noelle Florio, Plaintiff *in Propria Persona*
12 Harbor Hills Drive Port Jefferson New York 11777
631-793-1464; noellef77@protonmail.com

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  MAY 12 2023  ★

LONG ISLAND OFFICE

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

REV. NOELLE FLORIO

    PLAINTIFF

v.

WILLIAM FLOYD UNION FREE
SCHOOL DISTRICT

    DEFENDANT

_____/

**CV 23 3580**

CASE NO. _____

**BROWN, J.**

LOCKE, M. J.

## COMPLAINT FOR DISCRIMINATION UNDER

## NYS CONSTITUTION, AMERICANS WITH DISABILITIES ACT; TITLE VII OF THE CIVIL RIGHTS ACT OF 1964;

## NEGLIGENCE, EQUAL RIGHTS UNDER THE LAW, CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS

The plaintiff REV. NOELLE FLORIO sues the defendant WILLIAM FLOYD UNION FREE SCHOOL DISTRICT hereafter ("The District") (hereafter "defendant") for religious and medical discrimination, negligence, violation of equal rights under the law, and conspiracy to interfere with civil rights alleges the following:

Plaintiff, *Rev. Noelle Florio* ("plaintiff"), files this Complaint against Defendant, WILLIAM FLOYD UNION FREE SCHOOL DISTRICT ("defendant") and states as follows:

## INTRODUCTION

**1.**    This is a claim by plaintiff *Rev. Noelle Florio* against her employer for the violation of the NYS Constitution Article I Section II, III, VIII, NYS Penal Code 135.60, NYS Penal Code 145.15, Americans with Disabilities Act and Amendments Act ("ADA and ADA-AA"), 42 U.S.C. § 12101, et seq., and Constitutional and Civil Rights claims, 28 U.S.C. §1343 et seq., 42

U.S.C. § 1988; Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e et seq. ("Title VII"); for discrimination and retaliation on the basis of disability, and for prohibited actions taken on the basis of this disability under the "regarded as" prong; and for declaratory and injunctive relief under Title I of the Americans with Disabilities Act as implemented under 29 CFR Part 1630, *et sequitur.*

2. This action arises from Defendants failure to appropriately accommodate both a medical condition and religious belief and force an undue hardship of unpaid leave and procedural deficiencies in its adjudication of Plaintiff's employment rights.

3. This action arises out of the Defendant's conspiracy to deprive Plaintiff of inherent, sacred, and inviolable rights under the First, Fourth, Thirteenth and Fourteenth Amendments.

4. Plaintiff brings claims in this suit for declaratory judgment under both Federal Rule of Civil Procedure 57 and 28 U.S.C §§ 2201 and 2202.

5. This action also arises out of the Defendant's conspiracy to deny equal employment opportunity under color of law, which is protected by Title VII of the Civil Rights Act of 1964. Further the defendant violated NYS Human Rights Law, subject to liability either directly or via joint action or pervasive entwinement under Title 42 §§ 1981, 1983, 1985 and 2000(e) among others. The causes of action brought are:

(a) Violation of Constitutionally Protected Rights - First Amendment (freedom to refrain from association, freedom of speech, freedom of religious), Fourth Amendment (right to be secure in one's person and papers), Thirteenth Amendment (freedom from involuntary servitude), Fourteenth Amendment (due process, equal protection);

(b) Violation of 42 U.S.C. § 1981 Equal Rights Under the Law;

(c) Violation of 42 U.S.C. § 1985 Conspiracy to interfere with Civil Rights;

(d) Violation of 42 U.S.C. § 2000(e) Discrimination;

(e) Violation of 42 U.S.C. §§ 12112(4) and 12112(5) Americans with Disabilities Act;

(f) Violation of 42 U.S.C. § 1981(a) Harassment;

(g) Violation of NYS Constitution Article I § II

(h) Violation of NYS Constitution Article I § III

(i) Violation of NYS Constitution Article I § VIII

(j) NYS Penal Law 135.60 Coercion in the Third Degree

(k) NYS Penal Law 145.15 Criminal Tampering in the Third Degree

**6.**    Accordingly, plaintiff brings this action pursuant to the Violations of 42 U.S.C. § 1981, 1981(a), 1985, 2000(e) § § 1211(4) and 12112(5), NYS Constitution Article I Section II, III, VIII, NYS Penal Code 135.60, NYS Penal Code 145.15,  to recover all available relief in law, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) back/front pay; (iii) compensatory damages in whatever amount she is found to be entitled; (iv) an equal amount as liquidated damages, other monetary damages; (vi) an award of costs and reasonable court fees; and (vii) punitive damages to the extent available; (viii) pre-judgment and post-judgment interest; and (ix) a jury trial on all issues so triable.

## JURISDICTION AND VENUE

**7.**    This court has original and exclusive jurisdiction over plaintiff's claims pursuant to 28 U.S.C. §1331, in that the matters in controversy are brought pursuant to Constitutional and Civil Rights claims, 28 U.S.C. §1343 et seq., 42 U.S.C. § 1988; Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e et seq. ("Title VII"); Title I of the Americans with Disabilities Act of 1990 and the ADA-AA of 2008; 18 U.S.C. § 241, 42 U.S.C. §12101 and 42 U.S.C. §12112(a), (b) and (d)(4) as it pertains to "Discrimination"; as implemented by 29 CFR Part 1630.14(b)(3), (c) & (d) as it pertains to adverse employment actions, employers and medical examinations and interventions.

**8.**    This Court has jurisdiction over this action pursuant to the NYS Constitution Article I Section II, III, VIII, NYS Penal Code 135.60, NYS Penal Code 145.15, and New York Tort Claims Act for allegations of negligence.  Venue is proper as both the plaintiff and defendant reside or conduct business within Suffolk County, New York.

**9.**    Venue is proper in this judicial district under 28 U.S.C. §1391 because defendant does business in this judicial district and the acts complained of took place in this judicial district.

**10.** Plaintiff timely filed a charge of Discrimination against the defendant with the Equal Opportunity Employment Commission (EEOC) on or about the date of February 2, 2022.

**11.** On or about February 21, 2023, the EEOC issued plaintiff a Dismissal and Notice of Right to Sue against defendant with regards to this matter. A copy of the Right to Sue letter is attached as **Exhibit A.**

**12.** Plaintiff has exhausted the administrative remedies available to her.

**13.** Plaintiff filed her complaint within 90 days of the EEOC's issuance of the notice of right to sue.

## PARTIES

**14.** Plaintiff, Rev. Noelle Florio, resides in Port Jefferson, New York at the address of 12 Harbor Hills Drive and is a qualified individual with a disability within the meaning of the ADA and ADA-AA.

**15.** Plaintiff was an employee of the defendant, which is a "covered entity" within the meaning of the ADA and ADA-AA.

**16.** Defendant, William Floyd Union Free School District is a local government whose principal place of business is located at 240 Mastic Beach Road, Mastic Beach, NY 11951.

**17.** At all times material to this action, Plaintiff was an "employee" of defendant within the meaning of the ADA and ADA-AA and all other applicable laws.

**18.** At all times relevant, defendant was an "employer" as defined by 42 U.S.C. 12111(5).

**19.** From approximately September 1, 2006, until her forced leave on or about June 11th, 2021, plaintiff was employed as a sixth grade English teacher.

**20.** At all times material to this action, plaintiff was perceived as having a disability as defined by 42 U.S.C. §12102 (1) (2) and (3) and was subjected to adverse actions prohibited under this chapter because of perceived physical impairments whether or not these perceived impairments limited or were perceived to limit major life activities.

**21.** Specifically, plaintiff was perceived as disabled with a contagious disease and was not allowed to work because of defendant's discriminatory perceptions, policies and procedures.

**22.** At all times material to this action, plaintiff was, and is, a "qualified individual" under the ADA and ADA-AA as a person who met the legitimate skill, experience, education, or other requirements of the employment position that plaintiff held, and who can/could perform the "essential functions" of the position plaintiff held with or without reasonable accommodation.

**23.** At all times material to this action, defendant is/was an employer covered by the ADA and ADA-AA in that it employs more than 15 employees.

**24.** At all times material to this action, plaintiff was an employee entitled to be free from discrimination on the basis of a perceived disability under the ADA and ADA-AA, Title VII of the Civil Rights Act of 1964, and all other applicable federal and state laws.

## PLAIN STATEMENT

**25.** Defendant implemented several policies specifically related to the "management of Covid-19" referred to as "Reopening Plans", Memorandum of Agreements for School Closings, Covid Testing, and any and all incidents, events, stipulations related to "Covid-19" (hereinafter "Covid Policy", "policies") These had nothing to do with plaintiff's employment duties but sought to impose experimental medical interventions without any *bona fide* medical examination or diagnosis, medical necessity, legal authority or legal duty. The defendant claimed that the policies were intended to prevent the spread of what it believed to be a "deadly contagious disease" known as "Covid-19"; however, the defendant never had any means of measuring or determining whether its policies were effective. Additionally, the policies sought to circumvent the plaintiff's medical privacy rights, religious freedoms, and rights to informed consent, while also imposing medical treatments administered by laymen and without the supervision of any qualified physician, without any bona fide medical diagnosis, and without any judicial oversight or approval.

**26.** Defendant discriminated against plaintiff based upon perceived disability. When plaintiff objected, the defendant continued to impose accommodations; including but not limited to: medical examinations, medical interventions including mask-wearing; without first conducting an individualized assessment to determine if she was a direct threat. Defendant has used policies and procedures that harass, isolate, segregate, limit, classify, deny equal access and impose non-job-related medical exams and inquiries upon plaintiff. Defendant

also retaliated against plaintiff by interfering with her rights, imposing punitive measures including isolation and medical examinations, withholding her pay, and ultimately procuring charges of insubordination, incompetency, misconduct, and neglect of duty to terminate her employment. This is strictly prohibited under all federal and state laws.

27.     Defendant acted within and outside the scope of its capacity by its demand that plaintiff and others similarly-situated ("others") perform involuntary services under the color of law; by its efforts to thwart plaintiff's correspondence; by its unreasonable demand to search and seize plaintiff's and others' highly valuable and transferable medical papers; through its demand for plaintiff to associate with the State's totalitarian ideology; by its denial of Plaintiff's right to exercise of her medical and religious freedoms as a condition of public employment; by its failure to reasonably accommodate plaintiff's pre-existing disability; by its breach of contract and their tortious interference with plaintiff's contract with the District; and by its willful harassment, moral turpitude and denial of plaintiff's right to due process; thus unreasonably and unequally depriving plaintiff of her statutory and constitutional rights. Defendant's actions are illogical and unreasonable abuses of power.

28.     As a direct and proximate cause of defendant's negligent policies and the manner in which the employees of defendant imposed it upon the plaintiff, the plaintiff suffered substantial financial losses and severe adverse health consequences, and assault to her character which continues to this day.

## STATEMENTS OF FACT

29.     The Americans with Disabilities Act Amendments Act ("ADA and ADA-AA"), 42 U.S.C. § 12101, et. seq., as amended is a remedial statute aimed at addressing and providing remedy in response to Congress's findings that discrimination against individuals with physical or mental disabilities persist in critical areas like employment, and our nation's goals with respect to individuals with disabilities is to assure equality of opportunity and participation. 42 U.S.C. § 12101(a)(1)-(8). The ADA and ADA-AA is meant to protect qualified employees, like plaintiff, from discrimination, harassment and retaliation in the workplace on account of a real or perceived mental or physical disability. 42 U.S.C. § 12112.

**30.** Plaintiff advised defendant that she was being regarded as disabled by the defendant and that the defendant was making a record of a disability unrelated to any formally diagnosed disability unrelated to their "Covid-19 Policy" by mis-classifying her as substantially limited with impaired immune and respiratory systems affecting her ability to perform major life activities in the workplace including working, communicating with others, performing manual tasks, talking, and breathing without the use of mitigation measures.

**31.** Plaintiff on many occasions duly noticed defendant of her good faith opposition and sincerely held beliefs to discriminatory policies and procedures.

**32.** Under the ADA and ADA-AA an employer may not require an individual with disability to accept accommodations which such qualified individual chooses not to accept. 29 CFR 1630.9 (d). This is especially pertinent when accommodations are imposed for a perceived and unproven disability.

**33.** Under the ADA and ADA-AA an employer is required to conduct an individual assessment to determine whether an employee poses a 'direct threat' before it can impose any measures upon the employee. 29 CFR §1630.2 (r)

**34.** Under the ADA and ADA-AA it is considered discrimination on the basis of disability if the employer limits, segregates, or classifies an employee in a way that adversely affects such employee because of the disability. 42 USC § 12112

**35.** Under the ADA and ADA-AA an employer who discharges, disciplines, or discriminates against an employee in the manner described in subsection (a) is considered to have violated 29 CFR §1630.4 (a)

**36.** Under the ADA and ADA-AA employers are prohibited from retaliating against individuals who oppose discriminatory activities or who make charges, testify, assist, or participate in any manner in an investigation, proceeding or hearing. 42 U.S.C. § 12203 and 29 CFR Parts 1630.12(a) and (b) and Parts 1630.13(b), (c), (d) and Part 1630.14(c) and shall be subject to the enforcement provisions relevant to such violations set forth in sections 42 U.S. Code § 12117, 42 U.S. Code § 12133 and 42 U.S. Code § 12188.

**37.** Under the ADA and ADA-AA employers are prohibited from requiring medical examinations or making disability-related inquiries of employees unless such examination or inquiry is shown to be job-related and consistent with business necessity; 42 U.S.C. §12112(d)(4); 29 CFR §1630.13 (b).

**38.** Under the ADA and ADA-AA, employers are prohibited from sharing non-job-related medical classification without any regard to confidentiality; 29 CFR §1630.14 (c)

**39.** Plaintiff may proceed under the "regarded as" prong and the "record of" prong and this court has jurisdiction under the "regarded as" prong of the ADA and ADA-AA.

**40.** The plaintiff had been employed with the defendant from the date of September 1, 2006 until present (pending 3020-a proceeding determination). Her employment duties included being a licensed educator in the State of New York for children grades 1-12. More specifically, plaintiff was assigned to teach sixth grade English in the William Floyd Middle School located in Moriches, New York.

**41.** Beginning in October 19, 2021, the defendant adopted a Memorandum of Agreement ("MOA") Regarding "Covid Policy", herein after "the policy" in the absence of fully vaccinated status that sought to impose experimental medical treatments and other procedures related to anyone affiliated with the defendant or interacting with its staff members which breached its reasonable duty of care. A true and correct copy of this policy is included with this complaint as **Exhibit B**.

**42.** The defendant published and implemented a new policy known as its "Reopening Policy", in the month of July 2020 and has made continuous updates to such policy. The defendant identifies this policy as its "Reopening Policy" and the defendant admits or claims that the policy is intended to "prevent the spread of "Covid-19". A true and correct copy of this policy is included with this complaint as **Exhibit C**.

**43.** Plaintiff re-alleges the foregoing statements of fact and incorporates each fact herein and further alleges as follows. Plaintiff also alleges each and every one of the statements in her affidavit and incorporates each herein.

# GENERAL ALLEGATIONS

**44.**  The plaintiff alleges each and every provision of these "Covid" policies and incorporates each said provision into this complaint.

**45.**  At all times material to this action, defendant failed to comply with its duty under the ADA and ADA-AA once plaintiff validly notified defendant of plaintiff being regarded as disabled and misclassified as substantially limited and requested equal access under the ADA and ADA-AA.

**46.**  Defendant discriminated and retaliated against plaintiff for making a complaint that she was being regarded as disabled, thus asserting her entitlement to equal access under the ADA and ADA-AA.

**47.**  Defendant's policies and procedures are specifically implemented for the purpose of mitigating the disability which it regards plaintiff as having.

**48.**  Plaintiff requested the defendant to provide a copy of the individualized assessment[1] that it conducted to determine that plaintiff was a direct threat (by way of informed consent); however, defendant ignored the requirement and continued to demand that plaintiff participate in its "health control measures" or accommodations such as mask-wearing, medical examinations, inquiries and treatments under Emergency Use Authorization ("EUA").

**49.**  Rather than providing equal access or proving any exemption to the ADA and ADA-AA, defendant embarked on a series of adverse employment actions against plaintiff which were designed to deter plaintiff's good faith opposition to the policies and procedures.

**50.**  Defendant's policies and procedures limited plaintiff's right to invoke ADA and ADA-AA protections by refusing to recognize that plaintiff could claim a reason under Federal law for refusing to comply with the policies and procedures.  Instead, defendant insisted that plaintiff

---

[1] EEOC Technical Manual 2.2 (c)  "...the Supreme Court has stated and the Congress has reiterated, "society's myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairments."  The legislative history of the ADA indicates that Congress intended this part of the definition to protect people from a range of discriminatory actions based on "myths, fears and stereotypes" about disability, which occur even when a person does not have a substantially limiting impairment."

could only claim a "medical" exemption, which is interference with plaintiff's rights under the ADA and ADA-AA.

**51.** Defendant also engaged in adverse employment actions when plaintiff claimed the right of informed consent and the right to refuse to take part in clinical trials and noticed defendant that all the imposed mitigation measures fall under an EUA period.

**52.** Defendant's violation of the ADA and ADA-AA was not in good faith and was willful, and plaintiff sustained damages as a result of defendant's conduct including past and future earnings, lost opportunities and benefits, liquidated damages, emotional distress, and reasonable attorneys' fees and or costs.

**53.** There was never any "mandate" because it was not only negligent, but it also never created any new legal duty for anyone to comply, nor any new legal authority for anyone, except the Department of Health, to impose any experimental medical treatments on anyone. It was negligent because it was based upon the ludicrous premise that "one person needs to undertake a medical treatment in order to prevent illness in another person". If this were true, then the population of people on Earth and possibly all mammalian life would have become extinct thousands of years ago. If a medical treatment is effective, then one person could take it and be treated or cured. The so-called "mandate" admits on its face, by its very existence, that the medical treatments are not effective in any way whatsoever. Again, the so-called "mandate" created no legal duty or authority and was not legally binding upon anyone. The "mandate" is no more binding upon anyone than would be a movie script would be binding upon extras near a movie set. At the very least, the "mandate" failed to consider those with disabilities and failed to comply with the ADA and in fact, facilitated discrimination and retaliation by all those employers gullible enough to participate as if the "mandate" were anything more than a movie script.

**54.** If two people are required to make a medical treatment effective, then it is not effective, at all. Especially for employees and/or consultants of the defendant who are doctors, nurses, or directors of medicine; they should all know better.

**55.** The defendant advised plaintiff that its "Covid" policies were expressed by the New York Department of Health, and Governor of New York and were never a directive of the

District itself, however, it is undisputed that the District adopted any and all "rules, regulations, and guidelines" set forth by these agencies in absolute compliance to their totalitarian ideologies without question and in direct violation of any and all federal and state laws (not mandates or guidelines) that specifically address the requirement of medical and religious freedom.

56. The plaintiff requests that this court take judicial notice of every aspect and term of the State of New York's "Covid" policy, including revision of the policy and the state's current "Covid" policy now published at https://www.health.ny.gov/.

57. The plaintiff requests that this court take judicial notice of defendant's employee handbook, a true and correct copy of which is included and alleged as **Exhibit D**. The introduction of this handbook discloses a "Nondiscriminatory Notice" as well as a Purpose Statement: "designed to provide teachers with information that is unique to our school and to serve as a reference for procedures and policies utilized at the William Floyd Middle School."

58. As alleged throughout this complaint, defendant regularly and deliberately and negligently violated plaintiff's medical and health-related confidential information by allowing unauthorized employees access to plaintiff's medical history and records.

59. Plaintiff's medical information were routinely collected and disclosed to other employees and under circumstances where it was not required as part of her job, and in fact, this information was disclosed to unknown employees and possibly third parties who were not employed by the defendant.

60. Additionally, neither the defendant's employee handbook, nor its "Covid" policies provided any provisions for those regarded as having a disability, and failed to identify any employee or representative who was competent or qualified to assist those with disabilities, or who were regarded has having a disability. The policy also failed to identify any "accommodations" that would otherwise be cognizable under 29 CFR Part 1630.2(o). This is just another example of how carelessly these policies were implemented and likely, were never reviewed by any competent or qualified attorney to determine if the provisions were complete, correct and legally sufficient.

61. The Employee handbook and the "Covid Policies" explain "Health and Safety" or "Prevention of Disease Transmission" where each employee is required to recognize the hazards that may exist due to the nature of the work. However, not once did any of defendant's policies, nor any of its practices, have any procedures or protocols from dangerous bio-hazard materials, including but not limited to surgical masks worn for the ridiculous purpose of "preventing the spread of Covid". These masks were ignored, and no provisions were enforced regard their collection and disposal, and the defendant negligently permitted dozens of them every day to be left lying around or without proper disposal and no accountability for such a bio-hazard, if we are to believe defendant's claim that "Covid" is a deadly contagious disease. The same was true for histological or pathological specimens such as blood.

62. The adoption and implementation of defendant's "Covid" policies were negligent.

63. In spite of the vaccine manufacturers such as Pfizer, GlaxoSmithKline, Inovio Pharmaceuticals, Johnson & Johnson, Novavax Inc, Moderna, Sanofi, Heat Biologics, BioNTech, Vir Biotechnology, Vaxart, Moderna Therapeutics, Emergent BioSolutions, Dynavax, Geovax and Curvac each disclaiming all liability for their experimental vaccines during an emergency use authorization period, and the fact that the United States indemnified each and every one of these pharmaceutical companies for their so-called "vaccines" (which are not vaccines at all) and in spite of the announcement by the departments of health that these clinical trial experimental vaccines do not prevent transmission or infection of any disease, specifically the so-called "Covid-19 disease", the defendant was somehow and miraculously able to claim that its policy was able to "prevent the spread of Covid". This claim contradicts every authority in the health care industry and is based upon the false promise that defendant suddenly acquired the ability to treat or prevent the infection or transmission of a so-called "deadly contagious disease" when every other expert in the world admitted that it could not. This is not only delusional, but negligent.

64. The first provision in the State of New York's "Covid" policy section (a) under "Covid-19 Vaccination / Symptom Monitoring / Reporting:" of admits that defendant sought to impose an experimental medical treatment, that is, a "vaccine" during an emergency use authorization (EUA) period. The fact that such a "vaccine" requires a "booster" demonstrates that the

medical treatment has no medical efficacy or not enough to prevent infection or transmission of the so-called "Covid-19", even if there were evidence that such a disease did exist.

65. The defendant owed the plaintiff the duty of complying with or upholding the plaintiff's medical privacy rights, rights to informed consent, and all other rights applicable under federal and state law to in preservation of medical and religious freedoms.

66. The defendant owed the plaintiff the duty of fulfilling its obligations under the original terms of employment, which includes but is not limited to defendant's code of conduct and employee policies.

67. Plaintiff, under coercion, at first attempted to adhere to the masking policy, to no avail. Subsequently, and in good faith, plaintiff expressed her opposition by refusing to participate or comply with any and all "Covid policies". In addition to these policies being outside the scope and completely unrelated to her essential job functions, plaintiff expressed her constitutional and medical rights. Moreover, the defendant failed to give conspicuous notice as to the manner in which its policies were related in any way to plaintiff's essential job function, and because participating in the policies involved submitting to experimental medical interventions, doing so without the supervision of any physician, without any legal authority or duty, without any court order, and the disclosure of medical records and waiver of plaintiff's rights to informed consent.

68. The policies were based upon the implausible speculation and hypothetical belief that every employee, and the plaintiff, suddenly became infected, or would soon become infected, with the same exact disease and that this disease is a deadly contagious disease. This belief is of course based upon the unproven belief that viruses are contagious pathogens and that "Covid-19" is a deadly contagious pathogen, and that every employee, or every person in the country suddenly became infected with such disease or would imminently become infected.

69. The policies were also based upon the pure speculation and hypothetical belief that defendant suddenly acquired the legal authority and the legal duty to involuntarily impose such experimental medical treatments upon its employees and the plaintiff as a new condition of employment.

**70.**   The policies were also based upon the purely speculative and hypothetical belief that the defendant suddenly obtained the legal right and the legal duty to violate each employee's rights to medical privacy and informed consent without any judicial oversight or approval.

**71.**   The policies were also based upon the purely speculative and hypothetical belief that the defendant suddenly acquired the professional competence and qualifications to determine that these medical treatments and other procedures were medically necessary without the supervision of any *bona fide* and licensed physician.

**72.**   The defendant owed the plaintiff the duty of fulfilling its obligations under the original terms of employment where the defendant's so-called "Covid" policies were not relevant to the plaintiff's ability or willingness or qualifications to continue performing her essential job functions or employment duties.

**73.**   The defendant claims that its "Covid" policies were intended to "prevent the spread of Covid"; however, defendant had no reliable means of measuring or determining when and where any employee became infected with such a disease, or if an employee had become infected with such a disease on the job, and it had no means of excluding other factors not related to defendant's "Covid" policies that may have contributed to any such infection. At no time was any employee in a controlled environment that would have enabled the defendant to conclusively establish the proximate cause of any employee becoming infected with the so-called "Covid-19" disease.   The defendant, nor its "Covid" policies, had no way of determining the proximate cause of any employee becoming infected with such a disease and it cannot therefore, legitimately "prevent the spread of Covid", no matter what its policies, even if such a disease did exist.   For this reason alone, the defendant's policies were not only foolish and ignorant, but negligent.

**74.**   The defendant's policies were also negligent because the very provisions of the policies demonstrated that not one provision or medical treatment was expected to prevent, treat or cure any illness, especially the so-called "Covid-19" disease. The stated purpose for the policies was to "prevent the spread of Covid", but the treatments stated in the policies admittedly did not prevent the spread of "Covid" unless one employee undertook the treatment in order to prevent illness in another employee. <u>The policies are premised upon the ludicrous idea that its treatments and procedures required at least two people to</u>

participate in order to be effective; this is clearly set forth in the policies which stated that it applied to every employee, not just employees who believed they were at risk of infection. There has never been any scientific proof, **at any time in human history**, that in order for a medical treatment to be effective, one person has to undergo the treatment in order to prevent illness in another person. There is absolutely no science, anywhere in the world, demonstrating that two people are required in order for a medical treatment to be effective. Acting as if this were true is the stuff of Bugs Bunny cartoons and Hollywood movies.

**75.** Furthermore, defendant's negligent policies are also based on the foolish idea that even if someone participated in it, he would need to continue participating in it, even after treatment, and even if everyone around him had already been treated. This has to be the most idiotic medical treatment plan in all of human history, and therefore, negligent.

**76.** The defendant owed a duty to the plaintiff to comply with both state and federal laws for employers and employees. The defendant breached one or more of its duties to the plaintiff as more fully set forth and alleged herein.

**77.** The state's public health policy,[2] especially involving contagious diseases and deadly contagious diseases that lead to epidemics and pandemics, including but not limited to, those involving respiratory illness, requires judicial oversight upon petition to the court which can only be made by the department of health, and such petition must be based upon a physician's *bona fide* diagnosis and affidavit that the specific individual is an imminent threat to himself or others. The court may then promulgate an order imposing certain medical interventions upon the specific individual, following an evidentiary hearing that determined he posed an imminent threat to himself or others. This is an actual "mandate", a legal duty, to which only the department of health is subject and to which only the department of health can avail itself. This legal authority, and this legal duty, cannot be delegated and certainly, the defendant had no such legal duty nor legal authority to impose, not only medical treatments, but involuntary and experimental medical treatments during an emergency use authorization period.

---

[2] New York State Public Health Legal Manual, specifically, Sections 1.1 and 1.4

**78.** In fact, it was this very conduct by the Nazis in Germany that resulted in the Nuremberg Code,[3] a body if medical and ethical standards prohibiting any nation from imposing medical treatments on its population in violation of medical privacy and rights to informed consent. The Nuremberg Code eventually found its way into the federal laws of the United States and its Food and Drug Administration and is now memorialized in every states' public health policy by the concepts known as "rights to informed consent" and "medical privacy".

**79.** The defendant deliberately provided the plaintiff with false information, claiming that there was some law requiring her compliance with its "Covid" policies, specifically, defendant cited 10 NYCRR §2.61; to wit, this regulation creates no new legal duty nor legal authority for the defendant's policy. This regulation depends solely upon voluntary participation because, assuming it is legally binding at all, it fails to include any provision requiring anyone to actually disclose her medical records so that compliance could be verified. Assuming that the regulation is legally binding upon its face, it fails to include any provision requiring anyone, including the plaintiff, to disclose her medical history or vital statistics, so there is no possible way to impose the regulation upon anyone who chooses to exercise his medical privacy rights.

**80.** It is quite obvious that if the defendant had the authority to compel the plaintiff's disclosure of her medical records and vital statistics, then the defendant could have simply requested these records from plaintiff's physician and avoided all of the drama. Instead, defendant's policies were negligently based upon coercing and intimidating the plaintiff to waive her medical privacy rights, or simply penalize her for exercising these rights, by the manner in which it was imposed upon her by the defendant.

**81.** The defendant's suspension of plaintiff's employment was the direct and proximate cause of defendant's implementation of any and all policies related to "Covid" that involuntarily and negligently imposed experimental and non-job related medical examinations and treatments upon the plaintiff.

---

[3] United States of America v. Karl Brandt, Military Tribunal I, est. on 25 October 1946 under General Orders No. 68 issued by command of the United States Military Government for Germany

**82.** The defendant's "Covid" policies sought to impose a medical treatment known as a "Covid-19 vaccination" or "Weekly Covid-19 Testing" and "Masking at all times" upon the plaintiff, such that the plaintiff was required to submit to such medical treatment for which the consequences for refusing included the suspension of her employment and pending termination under NYS Education Law 3020-a administrative law.

**83.** The defendant's policies never identified any "vaccine" that was not an experimental medical treatment or outside the Food and Drug Administration's Emergency Use Authorization period; otherwise, not a clinical trial or epidemiological experiment.

**84.** The defendant's "Covid" policy was not based upon any *bona fide* medical diagnosis of the plaintiff, nor did it require the disclosure of plaintiff's medical records, assuming the policy created any new legal duty or authority in the first place.

**85.** The plaintiff directed the defendant to obtain any needed medical records from the plaintiff's physician but the defendant failed to request or obtain such medical records from the plaintiff's physician because of the plaintiff's medical privacy rights. The defendant's "Covid" policy sought to require the plaintiff to waive these rights by asking for her medical records directly, instead of requesting them from her physician. The fact that the defendant failed to and would not have been able to obtain such records from plaintiff's physician due to her medical privacy rights, establishes that the defendant's policy did not overcome or constitute any waiver of the plaintiff's medical privacy rights with any new legal duty or any new legal authority.

**86.** These new conditions, in defendant's "Covid" policies, were not subject to any supervision by a competent or qualified medical professional, such as a physician, failed to consider or provide protections for plaintiff rights to medical privacy or informed consent, and were not the result of any new legal duty or legal authority or court order, or court order obtained by the Department of Health.

**87.** All material acts and conduct took place upon the premises of the defendant at the location alleged, the date alleged and at the approximate times alleged.

**88.** The plaintiff suffered injury as a direct and proximate consequence of the defendant's actions or conduct that, at the very least fell below its standard of care as a direct and

proximate cause of the defendant implementing its so-called "Covid" policies, beginning from September 1, 2020 and continuing until present as a result of adverse actions taken by plaintiff's employer and the nature of the injury is described herein.

89.    The defendant and its employees were in control of the premises and solely responsible for the condition of the premises and the conduct alleged, all times material to this complaint.

90.    The defendant failed to fulfill its duty to provide for the safety and well-being of its employees, specifically the plaintiff.

91.    In fact, the defendant adopted policies that deliberately violated its duty of care by any reasonable standard, as more fully alleged herein, including but not limited to those described by the following allegations.  The defendant's so-called "Covid" policies were unsafe and involved imposing involuntary and experimental medical treatments that admittedly had no medical efficacy (because it relied upon one person being treated in order to prevent illness in another).

92.    The plaintiff alleges each and every provision and revision of its "Covid" policies and summarizes the material provisions by the following:

93.    The defendant's "Covid" policies purportedly required plaintiff to submit to medical devices and restraints such as face coverings, cloths, or surgical masks, as well as medical examinations known as "Covid tests", whether or not such test results were obtained by any licensed physician, or the consent of the plaintiff.

94.    The defendant's policies then required the plaintiff to disclose the test results, medical records, not to any physician, and not to the plaintiff's own physician, but to complete layman or another employee with absolutely no medical professional obligations to the plaintiff (i.e., someone who was not accountable as would be plaintiff's actual physician).

95.    Instead of requesting the plaintiff's medical records directly from the plaintiff's physician, knowing that plaintiff's physician would correctly refuse without the express written consent of the plaintiff, the defendant circumvented or attempted to circumvent this by coercing the plaintiff to waive her medical privacy rights to implementing its ridiculous "Covid" policies directly upon the plaintiff, and in the manner more fully described in this complaint.

**96.** The defendant's "Covid" policies purportedly required plaintiff to disclose her medical records to complete laymen with no medical training or expertise, referring to such condition as disclosing the plaintiff's "vaccine status" along with the results of these "Covid" tests.

**97.** The defendant's "Covid" policies imposed terms of segregation, isolation and quarantine without any judicial oversight.

**98.** The defendant's "Covid" policies failed to include any notice that its provisions were implemented during an official "emergency use authorization" or (EUA) period and that any medical treatments were experimental and not approved by the Food and Drug Administration (FDA).

**99.** The defendant's "Covid" policies purportedly required plaintiff to wear face coverings over her airways while working and failed to disclose that this involved the application of a medical device according to the FDA.

**100.** The defendant's "Covid" policies failed to include any provision explaining how any provision of the policy was related to plaintiff's essential employment duties.

**101.** The defendant's "Covid" policies purportedly required plaintiff to submit proof of vaccination or be subject to weekly covid testing but failed to disclose the fact that there were no FDA approved and commercially available vaccines.

**102.** The defendant's "Covid" policies failed to advise the plaintiff that the manufacturers of any these experimental vaccines disclaimed liability for their effectiveness and that they were indemnified by the United States government for any claims for adverse health consequences any of them might have caused.

**103.** The defendant's "Covid" policies failed to disclose that the so-called "vaccines" were in fact, not vaccines because, as admitted by the manufacturers, none of them prevented infection or transmission of any disease, specifically "Covid-19".

**104.** The defendant's "Covid" policies failed to disclose that the so-called "vaccines" were experimental and failed to disclose any medical necessity for any of them, or the medical efficacy for any of them.

**105.** The defendant's "Covid" policies failed to include any provision for those with disabilities.

**106.** The defendant's "Covid" policies failed to consider or recognize employees with contra-indications.

**107.** The defendant's "Covid" policies failed to include any provision for those with contra-indications to any of its medical treatments. In fact, plaintiff attempted to express that she had a contra-indication and sought to disclose her medical history and obtained a written statement from her physician indicating such contraindication. Despite this, defendant continued to subject her to its other medical treatments, or it was manipulated, denied and ignored by the defendant altogether.

**108.** The policies set forth conditions for compliance and consequences or penalties for non-compliance, along with time periods by which employees were required to comply or suffer the penalties, which included but were not limited to isolation, and leave without pay and eventual employment termination (pending).

**109.** The defendant's "Covid" policies collected, stored, used and even created medical records regarding the plaintiff based upon information it had already obtained for other legitimate purposes, and based upon its own conclusions, such as plaintiff's refusal to answer the "vaccine status" question, and based upon other data that the defendant collected with or without the consent of the plaintiff, and with or without any business necessity, and regarding the collection, storage and use of such data, the defendant failed to implement a reasonable "data retention policy" to protect the data against a data breach, including but not limited to accepting financial responsibility or providing the plaintiff with a reasonable remedy therefrom.

**110.** The policies failed to meet or satisfy reasonable standards for the protection of plaintiff's medical information and was thereby negligent.

**111.** The policies failed to express or describe the manner in which the plaintiff's data was disclosed to any third party, including but not limited to government agencies, federally funded agencies such as those in the university system, or private organizations.

**112.** The policies failed to express or describe any process by which the plaintiff would be able to correct or remove her information that was collected, stored and used by the defendant.

**113.** The policies failed to explain the business or other necessity for defendant's collection, storage and use of plaintiff's information.

**114.** The policies failed to include any meaningful or impartial oversight or dispute resolution or grievance procedure, or if it appears that there was such a procedure, the defendant refused to abide by the procedure, at least in good faith, or in any way.

**115.** At no time did the defendant attempt to obtain the consultation of any licensed health care professional regarding any one employee, specifically the plaintiff, and the implementation of its "Covid" policies.

**116.** At no time did the defendant even attempt to obtain additional insurance to accept financial responsibility for protecting its employees, or the plaintiff, from the "spread of Covid-19".

**117.** At no time did the defendant even attempt to obtain additional insurance to accept financial responsibility for any employee, or the plaintiff, suffering any adverse health consequences as a result of participating in or complying with its "Covid" policies.

**118.** While the defendant acted upon the unfounded presumption that first, there was such a deadly contagious disease and second, that every employee suddenly became infected with it, the defendant adopted its "Covid" policies in the most negligent manner as plaintiff describes herein.

**119.** Furthermore, at no time did the defendant ever attempt to verify with the local department of health, the state department of health or the United States Department of Health, whether or not such deadly contagious disease was either proven to exist or proven to be contagious.

**120.** At no time did defendant rely upon any court orders obtained from the department of health that determined any of its employees, specifically the plaintiff, to have such a disease.

**121.** Moreover, while the government proclaimed a public health emergency, there was never any evidence of such an emergency, and the respondent never obtained probable cause to legally impose any provisions of its negligent and *ad hoc* "Covid" policies.

**122.** The New York Department of Health admits that it had and still has no documentary or scientific evidence (any culture or specimen) of any *bona fide* "Covid-19" contagious disease. Contrary to Hollywood-style movies and Looney Tunes Cartoons, it is a scientific fact that viruses are not contagious pathogens in the first place. The Hollywood portrayal of "viruses" is a fantasy. Even with a histological or excretory specimen of any individual, there is no way to obtain valid test results establishing that the individual has or does not have any such disease as "Covid-19" for the simple reason that there is no sample by which the specimen can be compared. This demonstrates that there is <u>no evidence</u> of any public health emergency, merely a naked proclamation based upon pure speculation.

**123.** The official records of the medical examiner's office reveal that there was absolutely no cognizable change in either the morbidity or mortality rates for the year 2020; however, we can notice a significant increase in these rates following the practice of administering or unlawfully compelling people to take the experimental "vaccines" which have caused stroke, heart failure, neurological disorders, blood tissue clotting and related disorders, organ failure, sterility and death. These were not the direct and proximate result of the so-called "virus" but experimental medical treatments. This demonstrates that there is <u>no evidence</u> of any public health emergency, merely a naked proclamation based upon pure speculation.

**124.** The Department of Health did not receive one verifiable affidavit from any physician reporting any *bona fide* diagnosis of any certain individual having contracted "Covid-19". These are public records and can easily be verified but instead, everyone just accepts the fake news and what government officials blurt out in the news without any scrutiny. This demonstrates that there is <u>no evidence</u> of any public health emergency, merely a naked proclamation based upon pure speculation and those making these false claims (your mayor, governor, respondent, employers etc.) are participating in disaster fraud, as they are rewarded by money from the disaster relief funds.

**125.** At no time did the Department of Health file any petition to obtain any detention order from the court. Failing to apply for a detention order denies anyone who is adversely affected

by the so-called "Covid" policy the right to a be heard. If there was such a disease and if someone had been diagnosed with it, the Department of Health failed to fulfill its legal duty under the law. This demonstrates that there is no evidence of any public health emergency, but merely a naked proclamation based upon pure speculation. The fact that no such records exist again establishes that there is <u>no evidence</u> of any public health emergency.

**126.** Once again, we revisit the official public records of the Department of Health and discover that it has absolutely no documentary or scientific evidence, first of all that viruses are contagious pathogens, but more importantly, no evidence of the existence of the *ad hoc* "SarsCov2" or "Covid-19", whereby, no such specimen or culture has ever been isolated, purified and visualized by long-standing scientific standards. Once again, there is no evidence of any such public health emergency.

**127.** No single death certificate (public record) ever identified the so-called "Covid-19" as the single and certain cause of death; however, including the term in the actual certificate as a possible cause awarded the coroners and physicians huge sums of money. Once again, there is no evidence of any such public health emergency.

**128.** The announcement of public health emergency did not create any new legal authority or any new legal duty. Even if there were such an epidemic or pandemic, and even if the respondent's claim were proven to be true and correct, this fact alone did not suddenly give anyone, especially the defendant, any new legal authority, nor any new legal duty of care to compel laymen to impose the same exact medical treatment on everyone at the same time and without any diagnosis of any single individual, and without any judicial oversight or approval based upon a medical diagnosis that any one or more specific individuals within the "group", the entire city, had any such contagious disease.

**129.** There is no need to cite the pertinent laws and regulations because they are compiled in the <u>New York State Public Health Legal Manual</u> as previously cited.

**130.** Even if there were any single fiber of evidence that such a public health emergency did exist, the respondent did not thereby obtain any new legal authority, nor any new legal duty to act in the manner expressed in its related policies. Likewise, just because someone declared a public health emergency, even if it were true, this alone does not give anyone any

new legal authority or legal duty to violate the medical privacy rights of people in the community nor does it constitute any waiver of such rights.

131. Specifically, Sections 10 NYCRR 2.1(a) and 2.5 related to the actual legal duties of physicians (not employers) and the local health officer, the summary of which include: upon receiving an affidavit from a licensed physician that reports a specific individual as having a deadly contagious disease, or that he has been exposed to a toxic substance, the local health officer, if unable to obtain the cooperation of the individual, can apply to the superior court for an order imposing certain medical treatments upon the individual and also imposing quarantine or isolation measures, but only under certain conditions and for only a limited time. If, by competent evidence following a *bona fide* evidentiary hearing, the individual is proven to be a direct threat to himself or others, the court may order such measures to be imposed upon him. There has never been any cognizable authority for a mayor, or anyone from within the executive branch of government, to act as if everyone in the community had the same exact illness and then impose medical treatments upon everyone simultaneously, including forced medical examinations and compelling everyone to disclose his medical records for the purpose of policing such illegal policies. See also sections 1.12 through 1.44 of the <u>New York State Public Health Legal Manual</u> previously cited. There is absolutely no authority conferred upon the defendant to engage in this conduct itself. The duties of the Department of Health cannot be delegated and were never delegated or assigned to the defendant.

132. There is no authority anywhere that permits the defendant to act upon the declaration that there is a public health emergency, such as a deadly contagious disease, by imposing experimental medical treatments and examinations upon everyone simultaneously without any evidence or diagnosis or due process. This is clearly negligent.

133. At no time did the defendant make any meaningful effort to refrain from implementing its "Covid" policies, specifically upon receiving notice from the plaintiff that its policies were not job-related, did not fulfill any business necessity, and were not required by any law or court order, and were not based upon any *bona fide* medical diagnosis or risk of any kind.

134. At no time did the defendant attempt to verify the existence of any pandemic or epidemic; however, even if such condition did exist, it did not create any new legal duty for the defendant to impose its "Covid" policies, nor did it create any new legal authority, nor did

it waive the medical privacy rights, or the rights to informed consent, of the plaintiff or any other employee.

**135.** The defendant imposed unlawful and hazardous conditions upon the plaintiff for the use of its facilities. These unlawful conditions include but are not limited to imposing experimental medical interventions, negligently administered by laymen, without any legal authority or duty, and without any physician's supervision and in violation of plaintiff's medical privacy rights and her rights informed consent.

**136.** The defendant imposed unlawful and hazardous conditions upon the plaintiff for the use of the facilities. These unlawful conditions also include but are not limited to, involuntarily imposing experimental medical treatments on the plaintiff whereby, they were administered and imposed upon the plaintiff by laymen with no medical training and no accountability or financial responsibility of any kind.

**137.** The defendant's "Covid" policies were purely speculative, irrational and unreasonable because it was based upon the outrageous and illogical notion that in order to prevent illness in one person, that another person needs to undertake medical treatment. This ridiculous notion has never existed at any time in human history, has never proven to have any medical necessity or efficacy, is not and never has been taught in medical school, and is pure quackery and, in this case, negligent.

**138.** While defendant's "Covid" policies created no new legal duty of care, these policies violated defendant's long-standing legal duties of care as alleged herein. Specifically, the defendant violated its duty of care to provide a safe working environment by subjecting employees, specifically the plaintiff, to experimental medical interventions and acting outside of the scope of its charter which does not include practices reserved only to the department of health under the supervision of the court and failing to prevent or intervene in matters involving on-the-job harassment and the foregoing allegations.

**139.** The defendant's "Covid" policies created job insecurity for the plaintiff and other employees and exposed the plaintiff and subjected him to bullying or harassment while on the job and in the workplace.

**140.** The defendant's "Covid" polices provoked and instigated conflict and confrontation between the defendant and the plaintiff and between the plaintiff and her co-workers and other personnel working on the premises.

**141.** The defendant not only failed to provide plaintiff with support of management, but management itself was the cause of the stress, strife and violations suffered by the plaintiff.

**142.** The defendant's "Covid" policies created a poor and unsafe working environment, not only for the plaintiff but for other employees with whom the plaintiff needed to coordinate employment duties to complete necessary tasks.

**143.** The defendant had actual or constructive knowledge of the dangerous condition and should have taken action to remedy it.

**144.** The defendant should not have imposed any provision of its "Covid" policies, at least for the following reasons:

a) The defendant's policy denied the plaintiff any opportunity for informed consent.

b) The defendant's policies denied plaintiff's attempt to have any meaningful debate or discussion on any of its provisions with the defendant or how these provisions may adversely affect the plaintiff.

c) The defendant's policies violated the plaintiff's rights to medical privacy.

d) The defendant's policies were not implemented because of any new law or any court order obtained by the department of health.

e) The defendant's policies were not based upon any *bona fide* medical examination by a physician that justified the medical necessity of the intervention.

f) The defendant failed to establish any medical efficacy for the intervention.

g) No provision of the defendant's "Covid" policies advised or disclosed to the plaintiff the nature or possibility of any hazard or risk associated with any of the treatments, interventions or experimental treatments.

h) The defendant's "Covid" policies were hazardous and unsafe and not rooted or founded upon any scientific standards or *bona fide* medical advice pertaining to any single employee, including but not limited to the plaintiff.

i) The defendant's "Covid" policies were not based upon, and failed to describe any business necessity for which the policies were needed; and, failed to describe any legitimate business necessity for which the policies were needed.

j) The defendant's "Covid" policies failed to describe how they were related to the plaintiff's essential job function and in fact, it was not in any way related to plaintiff's essential job function.

k) The defendant's "Covid" policies and the defendant generally, had no possible means to measure or test whether or not it did in fact "prevent the spread of Covid" as defendant claimed it was intended.

l) The defendant's implementation of its "Covid" policies created the dangerous condition involving the involuntary imposition of experimental medical treatments without any judicial oversight or approval, without any physician's oversight, without any financial responsibility and in violation of each employee's medical privacy rights and rights to informed consent.

**145.** The policies were arbitrary, irrational and unreasonable because they were based purely upon some Hollywood-style "pandemic" movie such as "Outbreak", and the implausible scenario that every employee suddenly had become infected with the same exact deadly contagious disease within the same time period and that it was so deadly that it could be treated by people with absolutely no medical training, and without any *bona fide* medical diagnosis.

**146.** The defendant's policy neglects to consider the fact that, if there were such a deadly contagious disease, why would the defendant be permitted to involuntarily impose experimental medical treatments in the manner alleged? Which is more dangerous, an implausible contagious disease that suddenly infects over three hundred million people, or layman administering experimental medical treatments based upon the same speculation without any professional oversight or financial responsibility? If it really did exist and if it were

really so dangerous, why were the responsive policies so carelessly and negligently implemented?

**147.** Just like shouting "fire" in a crowded theater, the defendant's "Covid" policies instilled fear, anxiety and apprehension in every employee such that every time an employee had a cough or a symptom of the common cold, she believed she was not only going to die a horrible death but that she would infect other employees with the same demise, that they would "kill grandma". This created a very hostile and antagonistic working environment, especially between those who believed the defendant and those who either did not or did not agree with the defendant's policy.

**148.** The defendant's "Covid" policies failed to address the screaming reality that neither the defendant, nor any scientific principles known to mankind at this time in history, has the ability to establish the proximate cause behind any employee becoming infected with the fictitious "Covid-19" disease. The defendant's negligent "Covid" policies failed to address the very obvious situation where each employee ended his/her workday and left the premises and were free to roam about the town or travel to faraway lands and engage with unknown and unidentifiable "risks" or "infected people", and then return to his/her job to begin his/her next workday. It is by this fact alone that the defendant, no matter what its policies, is utterly incapable to "prevent the spread of Covid", by any stretch of the imagination, even if such a risk did exist. How then is it reasonable or equitable to punish any employee, the plaintiff, for refusing to participate in the policies? The policies, even if based upon correct and actual scientific findings, is completely useless simply because the defendant cannot control any employee's environment every moment of the day, whether at work or away.

**149.** This condition (i.e. "Covid" policies) existed for such a length of time that the defendant did know and should have known of the condition in which it began implementing in July of 2020.

**150.** The defendant created the condition of its own volition outside of any business necessity, legal duty, legal authority, or even common sense, and it occurred with regularity and was therefore foreseeable.

**151.** Defendant had a duty to keep its property reasonably safe and protect the plaintiff from dangers of which it should have been aware, and to warn the plaintiff of any concealed dangers which should have been known to the defendant; however, defendant had no legal duty of care to involuntarily impose medical treatments, or especially experimental medical treatments, in the manner alleged.

**152.** As a direct and proximate cause of the defendant implementing its "Covid" policies, the plaintiff suffered the loss of employment opportunities, loss of her employment in the amount of $8,275.94 per month (not including interest and negotiated salary increases) beginning from June 11th, 2021 and continuing to this day, pain, isolation, humiliation, defamation of plaintiff's good name, and the cash value for her 403(b) and cash balance pension and accruals worth approximately $100,000 (not including penalties incurred upon withdrawals, any and all applicable taxes) along with associated costs for medical care and lost benefits such forced use of personal accruals. Plaintiff also suffered the loss of coverage or other clubs and/or stipends to be determined. As a direct and proximate cause of defendant implementing its "Covid" policies, plaintiff suffered exorbitant financial losses in backpay and future pay to be determined.

**153.** The plaintiff suffered damages including but not limited to physical pain, lost wages, medical expenses, emotional damages, and other economic and non-economic damages.

**154.** The defendant failed to keep its property or premises in reasonably safe condition and to protect the plaintiff from dangers of which the defendant is or should have been aware; and failed to provide adequate notice or warning to the plaintiff of the likely adverse health effects that are consequential to any provision of its "Covid" policies. In fact, the defendant refused to discuss any aspects of its "Covid" policies with the plaintiff, including but not limited to her requests for defendant's legal duty and authority to impose it upon him, the medical necessity and efficacy of the policy, and for any legal basis that permitted the defendant to violate her medical privacy rights and rights to informed consent.

**155.** The defendant is thereby responsible for the result of its willful acts (i.e. its "Covid" policies) and also for plaintiff's injuries occasioned and suffered by the plaintiff because of defendant's want of ordinary care or skill in the management of its property or person.

**156.** The defendant's "Covid" policies are preempted by state law and contravenes long-standing public policy regarding the health of well-being of people in the community. Public policy as it concerns health matters, and specifically *bona fide* or proven "epidemics" or "pandemics", requires a *bona fide* medical diagnosis by a physician's affidavit, and judicial oversight and approval upon actions of the department of health. This role cannot be delegated, nor was it ever delegated to any private business or other government agency, and specifically, it was never delegated to the defendant. The power to impose vaccinations is reserved to the law making authority of the state, while subject to judicial oversight and approval, and even the state cannot involuntarily impose experimental medical treatments without evidence and judicial oversight and approval.

**157.** The plaintiff has no other remedy at law against the defendant.

**158.** The defendant's conduct continues to this day and is expected to continue without cessation into the future as it continues to irrevocably injure the plaintiff and other employees.

**159.** To this day, the defendant believes that the false and unproven reports made in the news and by government agencies about the so-called "Covid-19" somehow gave it the legal duty and legal authority to act in the negligent manner alleged herein. The defendant will parrot the false and unproven claim that the so-called "Covid pandemic" has killed millions of people, and then it will claim that the plaintiff is a "Covid denier"; however, <u>even if there were such a pandemic or even if there were such a disease</u>, <u>this is not a legal defense to negligence in this case</u>, and the defendant's acts and conduct were still negligent and the defendant still violated its many duties of care, none of which included imposing involuntary and experimental medical treatments upon anyone, including the plaintiff, and especially in the manner described by the plaintiff in this complaint.

**160.** Plaintiff re-alleges each statement from the affidavit herein.

<u>**COUNT I**</u>

<u>**DISCRIMINATION UNDER THE ADA and ADA-AA FOR PERCEIVED DISABILITY**</u>

**161.** Plaintiff incorporates each of the above statements of fact herein; the allegations contained in paragraphs 1 through 160 and the plaintiff's supporting affidavit which is also re-alleged and incorporated herein by reference.

**162.** Title I of the ADA prohibits employment discrimination on the basis of disability in all aspects of employment, in 29 CFR § 1630 *et sequitur;* and particularly §1630.4; § 1630.5.

**163.** Plaintiff is a qualified individual under the ADA and ADA-AA.

**164.** In July of 2020, defendant began regarding plaintiff as having the disability of a contagious disease and made a record of such disability by mis-classifying plaintiff as being substantially limited with an impaired immune system and an impaired respiratory system; and began requiring plaintiff to use mitigation measures to perform several major life activities in the workplace.

**165.** The defendant has made no meaningful efforts to remediate itself on the law and has only referred to statements made on the New York State Department of Health (NYSDOH) and Center for Disease Control (CDC) website, but this clearly does not qualify as an individualized assessment.

**166.** Despite having knowledge of plaintiff claiming protected status under the ADA and ADA-AA, defendant continued to limit, segregate, classify plaintiff due to its perception of plaintiff as a person with a disability within the meaning of the ADA and ADA-AA.

**167.** Defendant's responses to the requests made by plaintiff to cease the discrimination and harassment were in fact non-responsive, dismissive or harassing; a true and correct copy of each written communication is included in the attached Affidavit in Support of Complaint.

**168.** Despite plaintiff's written notices, defendant continued without cessation to harass the plaintiff based upon disability and religious affiliation by sending plaintiff numerous communications coercing plaintiff to accept various accommodations or suffer adverse employment actions. All written communications is included in the attached Affidavit in Support of Complaint.

**169.** Defendant imposed accommodations upon the plaintiff which included isolation and segregation such as demanding plaintiff remain 6 feet away from co-workers; refusing her access to the workplace; subjected her to medical examinations and medical interventions; placing plaintiff on unpaid administrative leave all without due process.

**170.** Defendant has failed to ensure equal access or accessibility of the premises where plaintiff is assigned to work. The plaintiff has thereby been prevented from enjoying equal access and the benefits of employment enjoyed by other employees.

**171.** Defendant's "COVID-19 policies and procedures" classified plaintiff in such a way that plaintiff's employment opportunities were adversely affected and limited because defendant would not permit plaintiff to do her job without first submitting to defendant's accommodations ("mitigation measures").[4]

**172.** An employer is entitled only to the information necessary to determine whether the employee can perform the essential functions of the job with or without reasonable accommodations and defendant has failed to identify any set of facts that would qualify under this limitation.

**173.** Defendant has never conspicuously disclosed or gave legally adequate notice that complying with the COVID-19 mitigation measures ("accommodations") are an **essential function** of the job of a William Floyd School District teacher; and the measures have never previously been an essential function of plaintiff's job. [5]

**174.** Defendant limited the accommodation measures[6], such as examinations; disclosures of medical records that were not job-related; experimental injections; medical interventions; equipment or products; to only those chosen by defendant. Additionally, defendant failed to prove that there are no other accommodations available which do not require injections, medical devices and medical examinations.

---

[4] prohibited by 29 CFR § 1630.5
[5] 29 CFR 1630.2 definition "Essential Function": "(i) ….the reason the position exists is to perform that function."

[6] 29 CFR Part 1630.2(j)(5)(i)

**175.** If plaintiff had previously made at least one request for reasonable modifications, plaintiff has since withdrawn such request.

**176.** The ADA and ADA-AA also protects individuals such as plaintiff for whom submitting to certain accommodation measures would create impairments. The accommodations include, but are not limited to, submitting to repetitive, non-job-related medical examinations (saliva testing, temperature checks); being placed under isolation, segregation and quarantine without due process; using medical devices for mitigation measures[7] (masks); disclosing plaintiff's medical records and history for non-job-related matters and participating in clinical trials and epidemiological experiments as a condition of employment.

**177.** Plaintiff requests that this court take judicial notice of Section 201(h) of the Food, Drug and Cosmetic Act and its Final Guidance titled, "Classification of Products as Drugs and Devices & Additional Product Classification Issues: Guidance for Industry and FDA Staff", published in September of 2017, in which the Food & Drug Administration **defines** wearing a mask for mitigation purposes as a medical device and the application of a medical device or contrivance. A true and correct copy of this is included as **Exhibit E**.

**178.** Plaintiff further requests judicial notice of the fact that the Food & Drug administration has never **approved** wearing such face masks, but only "authorized" them without any supporting medical or clinical data establishing any medical necessity or efficacy for wearing such contrivances.

**179.** Plaintiff requests that the court take judicial notice of the official mortality rates of the State of New York and the United States for the years from 2017, 2018, 2019 and 2020 in which the standard deviation is zero, the very definition of no verifiable "pandemic".

**180.** Plaintiff has been damaged by defendant's violation of the ADA and ADA-AA and has suffered damages, which include past and future earnings, lost opportunities and benefits, and emotional distress.

**181.** The conduct of defendant and its agents and employees proximately, directly, and foreseeably, injured plaintiff, including but not limited to, emotional pain and suffering,

---

[7]  Section 201(h) Food, Drug & Cosmetic Act

humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

**182.** The conduct of defendant was so willful and wanton and in such reckless disregard of the statutory rights of plaintiff so as to entitle her to an award of punitive damages against defendant, to deter it, and others, from such conduct in the future.

**183.** As a result of defendant's actions plaintiff has experienced discrimination, segregation, isolation.

**184. Plaintiff is entitled to any and all relief permitted under the ADA and ADA-AA, 42 U.S.C. § 12117(a), including equitable relief.**

**185. WHEREFORE**, Plaintiff respectfully requests entry of:

a. judgment in her favor and against defendant for violation of the anti-discrimination provisions of the ADA and ADA-AA;

b. ordering defendant to comply with the requirements of Title I of the Americans with Disabilities Act, 42 U.S.C. §12101; and

c. ordering defendant to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct and to eliminate, to the extent practicable, the effects of such conduct.

d. judgment in her favor and against defendant for actual and compensatory damages, including lost earnings, front pay, and/or all actual monetary losses suffered as a result of defendant's conduct;

e. judgment in her favor and against defendant for his reasonable attorney fees, costs and litigation expenses;

f. judgment in her favor and against defendant for punitive damages; and

g. an order granting such other and further relief as this Court deems just and equitable under the circumstances of this case.

**186.** Plaintiff demands a jury trial.

## COMPLAINT FOR RETALIATION UNDER
## AMERICANS WITH DISABILITIES ACT
## COUNT II

**187.** Plaintiff incorporates the above statements of fact and the allegations contained in the paragraphs 1 through 186 herein and plaintiff's supporting affidavit which is also re-alleged and incorporated herein by reference.

**188.** The ADA and ADA-AA also prohibits employers from retaliating against individuals who oppose discriminatory activities or who make charges, testify, assist, or participate in any manner in an investigation, proceeding or hearing under the ADA, Title 42 U.S.C. § 12203 and 29 CFR Parts 1630.12(a) and (b) and Parts 1630.13(b), (c), (d) and Part 1630.14(c).

**189.** On June 7th, 2021, defendant began unceasingly to retaliate against plaintiff despite plaintiff's reasonable good faith belief that she was exercising protected opposition to discrimination and claiming rights protected under the ADA and ADA-AA.

**190.** The plaintiff was coerced to "stay at home" because of her condition and has successfully stated a violation of the Act simply because she has been subjected to an action prohibited under the law because of perceived physical impairment.

**191.** On or about June 7th, 2021 until present day, defendant continued to threaten the plaintiff with suspension, dismissal, and termination even after it was aware of a pending EEOC investigation and plaintiff's protected opposition status.

**192.** Defendant coerced plaintiff to submit to the accommodation measures, medical interventions and examinations and other health control measures, even though defendant was duly advised by plaintiff that she was not subject to any health control measures by any court order, and that the defendant was not empowered by any court order or other legal duty to impose such interventions, examinations or control measures upon plaintiff. [8]

---

[8] See New York Public Health Law

https://www.nycourts.gov/whatsnew/pdf/publichealthlegalmanual.pdf

**193.** Defendant threatened plaintiff with the termination of employment then terminated her employment because of a perceived disability and as a result of classifying plaintiff as contagious.

**194.** Defendant's notices to plaintiff failed to include conspicuous notice as to the manner in which its accommodations ("Covid policies and procedures") are related to the performance of plaintiff's essential job functions, and also did not mention plaintiff's right of refusal under EUA guidelines[9].

**195.** Despite having knowledge of plaintiff claiming protected status under the ADA and ADA-AA, defendant terminated plaintiff's employment due to plaintiff's opposition to discriminatory policies and procedures.

**196.** Defendant also failed to give notice of plaintiff's right to refuse defendant's accommodations under the ADA and ADA-AA[10], and failed to advise plaintiff of her right to informed consent.

**197.** At all times material to this action, defendant interfered with the exercise of plaintiff's rights under the ADA and ADA-AA.

**198.** As a result of defendant's intentional, willful and unlawful acts by retaliating against plaintiff and interfering with plaintiff's rights under the ADA and ADA-AA, plaintiff has suffered injury and damages.

**199.** The injury suffered by plaintiff is thereby concrete and particularized and it is actual and imminent. The injury alleged in the complaint, including the pleading and exhibits, clearly sets forth a set of facts that actually occurred and are not conjectural or hypothetical. The injury described therein is at least fairly traceable to the challenged action, conduct and policies of defendant.

**200.** The harm (injury) already suffered by plaintiff includes, but is not limited to, having to choose between waiving rights to: medical privacy, informed consent, refusal to take part in

---

[9] Title 21, Chapter 9 V, Part E §360bbb-3a. Emergency use of medical products.

[10] 29 CFR Part 1630.9 (d) & (e)

clinical trials, and be free of discrimination and retaliation OR having plaintiff's employment terminated. Once violated, these rights cannot be recovered.

**201.** Defendant's policies and procedures demonstrate soundly and convincingly that it intends to inflict future harm against plaintiff based upon perceived disability; it fully intends to continue these policies and it fully intends to continue retaliating against plaintiff as alleged herein.

**202.** As a result of defendant's actions the plaintiff has experienced retaliation, coercion, interference, termination and disruption in plaintiff's career.

**203.** Defendant's efforts were to coerce plaintiff into submission, rather than to provide equal access, per defendant's duty, and were not objectively or subjectively in good faith, therefore plaintiff is entitled to liquidated damages or other monetary damages, including punitive damages to the extent available.

**204.** **WHEREFORE**, Plaintiff respectfully requests entry of:

a.      judgment in her favor and against defendant for violation of the anti-discrimination provisions of the ADA and ADA-AA;

b.      ordering defendant to comply with the requirements of Title I of the Americans with Disabilities Act, 42 U.S.C. §12101; and

c.      ordering defendant to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct and to eliminate, to the extent practicable, the effects of such conduct.

d.      judgment in her favor and against defendant for actual and compensatory damages, including lost earnings, front pay, and/or all actual monetary losses suffered as a result of defendant's conduct;

e.      judgment in her favor and against defendant for his reasonable attorney fees, costs and litigation expenses;

f.      judgment in her favor and against defendant for punitive damages; and

g.      an order granting such other and further relief as this Court deems just and equitable under the circumstances of this case.

**205.** Plaintiff demands a jury trial.

## COUNT III
## COMPLAINT FOR FIRST AMENDMENT FREE EXERCISE CLAIM

**206.** Plaintiff incorporates the above statements of fact and the allegations contained in the paragraphs 1 through 205 herein and plaintiff's supporting affidavit which is also re-alleged and incorporated herein by reference.

**207.** Mask mandate and proof of vaccination/testing mandate burdens plaintiff's exercise of religion.

**208.** Mask mandate and proof of vaccination/testing mandate is not neutral.

**209.** Mask mandate and proof of vaccination/testing mandate is far more restrictive conditions for religious accommodation requests than is required under Title VII of the Civil Rights Act and has nothing to do with the mandates purported purpose.

**210.** Defendant knew or should have known that Plaintiff has a clearly established right to free exercise under the First Amendment.

**211.** Defendant acted willfully, maliciously and with reckless disregard for plaintiff's constitutional rights.

**212. WHEREFORE,** Plaintiff respectfully requests entry of:

a.    judgment in her favor and against defendant for violation of the anti-discrimination provisions of Title VII  42 U.S.C § 2000e;

b.    ordering defendant to comply with the requirements of Title VII  42 U.S.C § 2000e; and

c.    ordering defendant to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct and to eliminate, to the extent practicable, the effects of such conduct.

d.      judgment in her favor and against defendant for actual and compensatory damages, including lost earnings, front pay, and/or all actual monetary losses suffered as a result of defendant's conduct;

e.      judgment in her favor and against defendant for his reasonable attorney fees, costs and litigation expenses;

f.      judgment in her favor and against defendant for punitive damages; and

g.      an order granting such other and further relief as this Court deems just and equitable under the circumstances of this case.

**213.** Plaintiff demands a jury trial.

## COUNT IV

## FIRST AMENDMENT FREEDOM TO REFRAIN FROM ASSOCIATION CLAIM

**214.** Plaintiff incorporates the above statements of fact and the allegations contained in the paragraphs 1 through 213 herein and plaintiff's supporting affidavit which is also re-alleged and incorporated herein by reference.

**215.** That a discrete quasi-suspect class of individuals have to be compelled or induced into surrendering papers to prove allegiance with totalitarian ideology, is no different from the State requiring employees to establish their loyalty by extracting oaths.

**216.** The principles that, under the First Amendment, an individual should be free to believe as he will, and that, in a free society, one's beliefs should be shaped by his mind and

**217.** his conscience, rather than coerced by the State, prohibit...support of an ideological cause he may oppose as a condition of holding a job as a public school teacher. *Abood v. Detroit Board of Education, 431 U.S. 209 (1977)*

**218.** The Supreme Court has prohibited a State from compelling any individual to affirm his belief in God, or to associate with a political party as a condition of retaining public employment. *Torcaso v. Watkins, 367 U.S. 488 (1961)*

**219.** They are no less applicable to this case.

**220.** An examination of our Nation's history, legal traditions, and practices demonstrates that the right to expressive association has been recognized by the courts as a fundamental right.

**221.** Defendant knew or should have known that Plaintiff has a clearly established right of association. First Amendment; NYS 243.662 (1973); *Abood v. Detroit Board of Education (1977); NAACP v. Alabama (1958)*

**222.** Defendant acted under the color of law, to impose the force of the state in order to induce K-12 school employees into surrendering papers in order to ascertain personal, private, and protected medical information.

**223.** Defendant deliberately conspired to compel or induce Plaintiff into surrendering her personal, privileged, and medically protected information.

**224.** Plaintiff was forced to associate with ideological beliefs unrelated to public education.

**225.** Plaintiff was satisfactorily performing her job for over fifteen (15) years when she was forced on an unpaid leave for refusing to associate with the totalitarian ideologies with which Plaintiff is conscientiously against.

**226.** Defendant's demand for medical papers from all the School employees as a condition of employment under the color of "Mask Mandate" as law, shows a custom, practice and de facto policy of forced association with the defendant's adopted ideologies from the State of New York.

**227.** Defendant acted willfully, maliciously or with reckless disregard for Plaintiff's constitutional rights.

**228. WHEREFORE,** Plaintiff respectfully requests entry of:

    a.    judgment in her favor and against defendant for violation of the anti-discrimination provisions of the U.S. Const., amend. I.

    b.    ordering defendant to comply with the requirements of U.S. Const., amend. I.

c.     ordering defendant to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct and to eliminate, to the extent practicable, the effects of such conduct.

d.     judgment in her favor and against defendant for actual and compensatory damages, including lost earnings, front pay, and/or all actual monetary losses suffered as a result of defendant's conduct;

e.     judgment in her favor and against defendant for his reasonable attorney fees, costs and litigation expenses;

f.     judgment in her favor and against defendant for punitive damages; and

g.     an order granting such other and further relief as this Court deems just and equitable under the circumstances of this case.

**229.** Plaintiff demands a jury trial.

**COUNT V**

**DISCRIMINATION BECAUSE OF RACE, COLOR OR RELIGION CLAIM;
VIOLATION NYS CONSTITUTION ARTICLE 1 § III, VIII**

**230.** Plaintiff incorporates the above statements of fact and the allegations contained in the paragraphs 1 through 229 herein and plaintiff's supporting affidavit which is also re-alleged and incorporated herein by reference.

**231.** The School is an "employer", for the purposes of NYS Labor Law Section 2.

**232.** Plaintiff is an "employee" for the purposes of NYS Labor Law Section 2.

**233.** Plaintiff holds religious beliefs and is a member of a religious protected class.

**234.** The discrimination is not a result of a bona fide occupational qualification reasonably necessary to the normal operation of the District's business.

**235.** Defendant distinguished plaintiff based on plaintiff's conscientious expression of her beliefs; and made the decision to refer Plaintiff for psychiatric evaluation, based on the religious distinction as a sole, motivating factor for the disparate treatment.

**236.** **WHEREFORE**, Plaintiff respectfully requests entry of:

a.      judgment in her favor and against defendant for violation of the anti-discrimination provisions of Title VII  42 U.S.C § 2000e;

b.      ordering defendant to comply with the requirements of Title VII  42 U.S.C § 2000e; and

c.      ordering defendant to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct and to eliminate, to the extent practicable, the effects of such conduct.

d.      judgment in her favor and against defendant for actual and compensatory damages, including lost earnings, front pay, and/or all actual monetary losses suffered as a result of defendant's conduct;

e.      judgment in her favor and against defendant for his reasonable attorney fees, costs and litigation expenses;

f.      judgment in her favor and against defendant for punitive damages; and

g.      an order granting such other and further relief as this Court deems just and equitable under the circumstances of this case.

**237.** Plaintiff demands a jury trial.

## COUNT VI
## CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS;
## VIOLATION NYS CONSTITUTION ARTICLE 1 § II

**238.** Plaintiff incorporates the above statements of fact and the allegations contained in the paragraphs 1 through 237 herein and plaintiff's supporting affidavit which is also re-alleged and incorporated herein by reference.

**239.** Defendant, because of religious animus towards Plaintiff, willfully and maliciously conspired, planned and agreed using misrepresentation, coercion or intimidation, to prevent plaintiff from seeking the equal rights, privileges and immunities of citizens under the laws of the United States and the State of New York including but not limited to plaintiff's rights to religious freedom, freedom of association; as well as plaintiff's right to be secure in her person and her papers.

**240.** Pursuant to their conspiracy, plaintiff was induced to associate with the ideological dictates of the Governor of New York as per the defendant's inflexible adherence to the Executive Order despite exceptions built into the Order that compliance must be in accordance with all applicable federal and state laws.

**241.** Pursuant to their conspiracy, defendant willfully, intentionally, recklessly, maliciously and with callous indifference, intimidated and harassed plaintiff, subjected plaintiff to interrogation of plaintiff's religious beliefs, while uttering threats to accept accommodations and/or terminate plaintiff for not "complying".

**242.** The inquisition caused plaintiff to become stricken with fear of imminent and actual loss of livelihood and to suffer extreme terror, mental anguish and emotional and physical distress.

**243.** A discriminatory animus was created by the perceived authority the defendant gained over plaintiff, in their conscious objective to violate her substantive rights under the color or law.

**244.** Defendant orchestrated overt acts for the purpose of directly depriving plaintiff, because of plaintiff's religion.

**245.** Defendant can be said to be the final decision makers for the subject matter in this Claim.

**246.** Defendant willfully, maliciously or with reckless disregard for plaintiff's constitutional rights.

**247.** **WHEREFORE**, Plaintiff respectfully requests entry of:

a.    judgment in her favor and against defendant for violation of the anti-discrimination provisions of the Title 18 U.S.C § 241;

b.     ordering defendant to comply with the requirements; and Title 18 U.S.C § 241

c.     ordering defendant to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct and to eliminate, to the extent practicable, the effects of such conduct.

d.     judgment in her favor and against defendant for actual and compensatory damages, including lost earnings, front pay, and/or all actual monetary losses suffered as a result of defendant's conduct;

e.     judgment in her favor and against defendant for his reasonable attorney fees, costs and litigation expenses;

f.     judgment in her favor and against defendant for punitive damages; and

g.     an order granting such other and further relief as this Court deems just and equitable under the circumstances of this case.

**248.** Plaintiff demands a jury trial.

### COUNT VII
### COERCION AND CRIMINAL TAMPERING IN THE THIRD DEGREE

**249.** Plaintiff incorporates the above statements of fact and the allegations contained in the paragraphs 1 through 248 herein and plaintiff's supporting affidavit which is also re-alleged and incorporated herein by reference.

**250.** Defendant willfully and maliciously coerced and intimidated plaintiff because plaintiff sought to exercise her right to abstain from engaging in conduct in which she has the legal right to do so. By means of instilling her in fear (and actuality) that she would be removed from her position, a right to her property, and all other freedoms she is legally entitled to, because she did not comply to its demand. Plaintiff is entitled to equal rights, privileges and immunities of citizens under the laws of the State of New York including but not limited to plaintiff's rights to religious freedom, and freedom of association.

**251.** Pursuant to the defendant's conspiracy with the State of New York and other "actors", plaintiff was induced to associate with the ideological dictates of the Governor of New York as

per the defendant's inflexible adherence to the Executive Order despite exceptions built into the Order that compliance must be in accordance with all applicable federal and state laws.

**252.** Pursuant to the defendant's conspiracy and coercion, defendant willfully, intentionally, recklessly, maliciously and with callous indifference, intimidated and harassed plaintiff, caused physical injury and caused damage to her property.

**253.** Plaintiff's private medical information and physical body is plaintiff's property. Requirement to relinquish plaintiff's private information or to affix medical devices to plaintiff's body is tampering with plaintiff's object of legal rights.

**254.** The defendant's coercive demands caused plaintiff to become stricken with fear of imminent and actual loss of livelihood and to suffer extreme terror, mental anguish and emotional and physical distress.

**255.** Defendant orchestrated overt acts for the purpose of directly depriving plaintiff, because of plaintiff's religion, and actual and perceived medical condition(s).

**256.** Defendant can be said to be the final decision makers for the subject matter in this Claim.

**257.** Defendant willfully, maliciously or with reckless disregard for plaintiff's constitutional and state rights.

**258.** **WHEREFORE**, Plaintiff respectfully requests entry of:

a.      judgment in her favor and against defendant for violation of the NYS Penal Law 135.60; 145.15

b.      ordering defendant to be held accountable with the requirements; NYSPL 135.60; 145.15

c.  '   ordering defendant to take such affirmative steps as may be necessary to prevent the recurrence of any coercive conduct and to eliminate, to the extent practicable, the effects of such conduct.

d. judgment in her favor and against defendant for actual and compensatory damages, including lost earnings, front pay, and/or all actual monetary losses suffered as a result of defendant's conduct;

e. judgment in her favor and against defendant for his reasonable attorney fees, costs and litigation expenses;

f. judgment in her favor and against defendant for punitive damages; and

g. an order granting such other and further relief as this Court deems just and equitable under the circumstances of this case.

**259.** Plaintiff demands a jury trial.


WHEREFORE plaintiff demands judgment against the defendant for actual and compensatory damages, punitive damages, attorney fees and other relief as this court deems appropriate.

DATED this ___ day of May 2023.

Noelle Florio,

Plaintiff in *propria persona*